# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-1370V
(not to be published)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * <br>                                       * <br> JACQUELINE DICKSON               * <br> AKA JACQUELINE BARKER,         * <br>                                       * <br>             Petitioner,             * <br>     v.                                       * <br>                                           * <br> SECRETARY OF HEALTH             * <br> AND HUMAN SERVICES,               * <br>                                       * <br>             Respondent.           * <br>                                       * <br> * * * * * * * * * * * * * * * * * * * * * * * * * | Special Master Corcoran <br><br><br> Filed: April 17, 2018 <br><br> Entitlement; Ruling on Record; <br> Influenza ("flu") Vaccine; <br> Guillain-Barré Syndrome ("GBS"); <br> Proof of Injury |

*Kathy A. Brown,* Kathy Brown Law, PLLC, Charleston, WV, for Petitioner.

*Mallori B. Openchowski,* U.S. Dep't of Justice, Washington, DC, for Respondent.

### DECISION DENYING ENTITLEMENT[1]

On October 20, 2016, Jacqueline Dickson filed a petition seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine Program").[2] In it, Ms. Dickson alleged that the influenza ("flu") vaccine she received on October 22, 2013, caused her to develop Guillain-Barré syndrome ("GBS"). Petition (ECF No. 1) at 1.

Respondent's Rule 4(c) Report (filed August 11, 2017 (ECF No. 23)) proposed that in fact Petitioner had *not* experienced GBS, and/or that it was diagnosed far too long after the vaccine's

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims's website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012)). **This means that the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act.

administration to be deemed causal. *See* Sections 11(c)(1)(D), 13(a)(1). Although Petitioner was provided an opportunity to file an expert report, she was unable to secure an expert to support her claim, and instead filed a Motion for Ruling on the Record, dated October 31, 2017 (ECF No. 24) ("Mot."). Respondent thereafter opposed Petitioner's entitlement to a damages award by response dated November 14, 2017 (ECF No. 25) ("Opp."). Having completed my review of the evidentiary record and the parties' filings, I hereby **DENY** Petitioner's request for compensation, for the reasons stated below.

I.    Factual Background

    A.    Medical Records

*Vaccination and Reported Initial Reaction*

On October 22, 2013, Ms. Dickson received the flu vaccine at Veteran's Health Administration in Lake City, Florida. Ex. 22 at 1 (ECF No. 8-1). At the time of the vaccination, she had a history of hyperlipidemia, restless leg syndrome, and hypertension. Ex. 3 (ECF No. 1-2) at 1. Earlier records also indicate prior treatment for toe fungus, flu symptoms, bladder spasms, leg pain, sleep disorder, acid reflux/GERD, and gallbladder disease. Ex. 7 (ECF No. 18-7) at 3-4, 12.

About two weeks later, on November 4, 2013, Petitioner presented to the VA occupational health clinic (also in Lake City) with complaints of swelling and pain following flu vaccination. Ex. 1, Tab 1 (ECF No. 26-2) at 3. She reported having received the flu vaccine in October, but denied any immediate adverse reaction. *Id.* She also stated that her symptoms had improved, but that she still was experiencing upper extremity heaviness and swelling in her left leg. *Id.* at 3-4. Upon examination, Ms. Dickson ambulated slowly and had difficulty bending her knee. *Id.* at 4. Attending L.P.N., Ms. Deborah Seelbach, noted that Petitioner's left knee was "visually different than right" and referred her to her primary care provider ("PCP") for follow-up treatment. *Id.*

The next day, on November 5, 2013, Ms. Dickson presented to her PCP, Dr. Tommy Randolph, at Randolph Medical Practices in Lake City, Florida. Ex. 24 at 1 (ECF No. 8-3); Ex. 7 at 10 (ECF No. 18-7). During the visit, she reported having received the flu vaccine on October 22nd, and thereafter developed right arm pain, general myalgia, and elbow and shoulder pain. Ex. 24 at 1. She also complained of nausea, vomiting, fatigue, and leg pain. *Id.* After an examination, Dr. Randolph noted that Petitioner displayed lower extremity swelling, but normal reflexes. *Id.* He

diagnosed Ms. Dickson with "arthralgia/myalgia after flu vaccine ? rxn." *Id.* Current medications listed at this time included Gabapentin, Nexium, and Simvastatin. Ex. 7 at 12.

Petitioner returned to see Dr. Randolph on November 19, 2013. Ex. 7 at 13. Again, her chief complaint (as set forth in the medical record) was swelling muscles and joint pain following a purported flu vaccine reaction. *Id.* During the visit, she stated that her symptoms had improved with Prednisone. *Id.* However, she now complained of additional symptoms, including muscle soreness, swelling of extremities, and knee pain. *Id.* Upon examination, Dr. Randolph noted that Petitioner had left lower extremity quad weakness and bilateral decreased ankle reflexes. *Id.* at 14. He again noted "? flu shot rxn." He recommended that Ms. Dickson continue using Gabapentin and referred her to a neurologist. *Id.*

No other records from 2013 were filed in this case. Significantly, I have seen no records from the two months after vaccination in which any physician proposed that Petitioner was suffering from GBS, or conducted any testing that would corroborate her claim that she was experiencing it.

*2014 Treatment and First GBS References*

On February 27, 2014 (now almost four months post-vaccination), Ms. Dickson presented to internist Stephanie Hines at the Mayo Clinic in Jacksonville, Florida. Ex. 1, Tab 3 (ECF No. 26-4) at 3. During this visit, she reported symptoms that she represented had begun "several days" after her receipt of the flu vaccine in the prior year. *Id.* In particular, she claimed to have developed an "intense restless" sensation in her arms and legs, causing sleep inconsistencies. *Id.* According to Ms. Dickson, a dose of steroids had alleviated some of the swelling in her left hand and leg. *Id.* She denied numbness, paresthesia, or tingling, however. *Id.* Laboratory results conducted during the consultation were largely normal. *Id.*

Upon evaluation, Dr. Hines observed mild weakness in Petitioner's left upper extremity, bilateral interosseous muscles, and bilateral proximal lower extremities. Ex. 1, Tab 3 at 6. Dr. Hines did not make a formal diagnosis, but noted a reporting of "weakness and achiness following influenza vaccination." *Id.* Dr. Hines also noted Ms. Dickson reported to her that a diagnosis of GBS had been considered sometime prior, but that no testing had been completed (including imaging, a lumbar puncture, or EMG) – and the record does not indicate what physician proposed

3

this diagnosis. *See id.* Dr. Hines referred Ms. Dickson to neurology and rheumatology for relevant testing. *Id.*

Petitioner thereafter saw a rheumatologist, Dr. Ronald Butendieck, at the Mayo Clinic on February 28, 2014. Ex. 1, Tab 3 (ECF No. 26-4) at 24. She presented with complaints of joint pain and myalgias. *Id.* The flu vaccine was included in the "allergic reactions" section of the record, but noted as well that "no reactions were documented." *Id.* at 25. GBS was also identified under the "problems" heading, but no further information was noted, nor any basis provided for the diagnosis. *Id.* at 25. After a neurological evaluation, Dr. Butendieck stated that Ms. Dickson had displayed normal deep tendon reflexes (DTRs), intact cranial nerves, and mild weakness in the left hand, but "no significant deficits." *Id.* at 28. In addition, laboratory tests conducted revealed a negative rheumatologic panel with no elevation in inflammatory markers, although other findings were consistent with hypothyroidism. *Id.* at 23.

Petitioner returned to see her PCP, Dr. Randolph, on March 4, 2014, for a follow-up appointment. Ex. 7 at 28. She informed him that she had been diagnosed with hypothyroidism, and complained of left and right side weakness. *Id.* Dr. Randolph proscribed medication for her thyroid condition, and recommended that she follow-up with her endocrinologist for monitoring. *Id.* at 29.

On March 21, 2014, Ms. Dickson returned to the Mayo Clinic for a neurology consultation with neurology resident, Dr. Asim Ahmad. Ex. Ex. 1, Tab 3 (ECF No. 26-4) at 10. She presented with complaints of "intense muscle aches" in her legs (similar to restless leg syndrome), but with increased intensity following receipt of the flu vaccine the prior fall. *Id.* She also presented with complaints of myalgias and arthralgias. *Id.* According to the record, Ms. Dickson described her condition as diffuse in nature, with muscle weakness beginning first in the lower extremities, then moving to the upper. *Id.* Upon evaluation, however, Dr. Ahmad noted that Petitioner exhibited normal motor strength in all extremities and normal sensation in her extremities. *Id.* at 12. In addition, an EMG conducted during the visit produced normal readings, and Petitioner ambulated with a normal gait. *Id.* Based on the foregoing, Dr. Ahmad concluded that Petitioner did not have a neurological problem, proposing instead that her symptoms here more likely attributable to her thyroid condition. *Id.* at 12-13. Dr. Ahmad did not suggest a follow-up neurology consultation. *Id.* at 13.

4

*Additional 2014 Treatments*

Two months later, On May 19, 2014, Petitioner presented to an endocrinologist, Dr. Sahzene Yavuz, for a hypothyroidism consultation. Ex. 8 (ECF No. 18-8) at 1. During the visit, Petitioner stated that her symptoms had "started after she had a flu vaccine in October [2013]," but that no definitive diagnosis had ever been made explaining the etiology of those symptoms. *Id.* Dr. Yavuz opined that Petitioner did not have "overt" hypothyroidism, and instead attributed her on-going symptoms to a "viral syndrome" or "ongoing medical problems." *Id.* at 13. She prescribed additional medication and suggested that Petitioner return for a follow-up appointment in two to three months. *Id.* at 10. Dr. Yavuz's notes also indicated, however, that Petitioner had a B12 deficiency that should be monitored as it could "cause peripheral neuropathy." *Id.* at 9.

Ms. Dickson began attending physical therapy on June 4, 2014. Ex. 33 (ECF No. 8-11) at 1; Ex. 6 (ECF No. 18-6) at 1. Although Petitioner reported that she continued to experience a great deal of weakness (*e.g.*, difficulty getting up from the floor or up from a chair), her therapists noted that she had "functional strength in arms and legs." Ex. 6 at 1. Her working diagnosis was "muscle weakness (generalized")." *Id.* The record described Ms. Dickson's condition as "Guillain-Barre-type symptoms status-post flu vaccination," but did not indicate the basis for the reference. *Id.*

On June 6, 2014, Petitioner returned to see Dr. Hines for a follow-up appointment relating to her overall health course. Ex. 1, Tab 3 (ECF No. 26-4) at 1. Dr. Hines noted that Petitioner had been diagnosed with Hashimoto's thyroiditis, and her rheumatology evaluation was negative for any underlying autoimmune conditions. *Id.* An EMG study conducted during the visit revealed "no evidence for a neuropathy or myopathy." *Id.* at 2. This record also noted that Ms. Dickson had previously been seen by Dr. Thomas Rizzo, a neurologist, who evaluated Petitioner, and also expressed the view that there was "no evidence of acute demyelinating polyneuropathy (such as Guillain Barre)." *Id.* During the visit, however, Petitioner reported to Dr. Hines that she continued to experience weakness and voiced concerns that she had in fact developed GBS. *Id.* Dr. Hines ultimately recommended physical therapy, and indicated that she would refer back to neurology for any future flu vaccinations recommendations. *Id.*

Petitioner returned to see her PCP, Dr. Randolph, on July 8, 2014, complaining of weakness in her left extremities, some paresthesias and left side numbness, and shortness of breath. Ex. 7 at

31. Dr. Randolph, however, listed the chief complaint as GBS. *Id.* Upon examination, Dr. Randolph noted that Petitioner had decreased grip strength in the left hand and decreased left lower extremity strength. *Id.* He referred Petitioner back to the Mayo Clinic and suggested Petitioner continue physical therapy for "unilateral weakness." *Id.* at 31-31.

On July 25, 2014 (now nine months post-vaccination), Petitioner presented to Dr. Prasad Nidadavolu, a neurologist at the Lake City Institute of Neurology in Lake City, Florida. Ex. 3 at 1 (ECF No. 18-3). During the visit, Ms. Dickson recounted a health history of progressive weakness since October 2013. *Id.* She told Dr. Nidadavolu that her symptoms began with tingling and numbness in the legs, and progressed into a generalized weakness in the arms and legs. *Id.* Upon evaluation, however, Dr. Nidadavolu recorded a 4/5 strength in bilateral iliopsoas, and weakness in the intrinsic muscles of the left hand with normal bulk and tone, and 2+ DTRs. *Id.* Dr. Nidadavolu's assessment nevertheless included GBS, and in his care plan he reported that she had experienced sudden onset weakness after her flu shot that "improved gradually." *Id.* at 2. Other test results, however, seemed to corroborate the lack of evidence of a demyelinating injury. Thus, a July 30, 2014 MRI of Petitioner's thoracic spine revealed multilevel degenerative changes without evidence of herniation or neural intramedullary cord signal abnormalities and a mild disc bulge at L1/2 and L5/81. Ex. 3 at 5.

Petitioner filed a number of additional records in this case memorializing treatments she received from the fall of 2014 to the spring of 2017. Such records reveal her continuing complaints about weakness, and a history of reporting to treaters that she previously experienced, or was diagnosed with, GBS. *See, e.g.,* Ex. 33 (ECF No. 8-12) at 1 (March 2015 hospital admission record); Ex. 4 (ECF No. 18-4) at 1 (billing record); Ex. 5 (ECF No. 18-5) at 19 (neurologist's reference to Petitioner's "self-diagnosed Guillian Barre syndrome"). But there is no additional evidence from the periods a year or more after vaccination that corroborates Petitioner's claim that she was ever actually diagnosed with GBS – while there are records suggesting that it was in fact not an accurate explanation for her symptoms. *See, e.g.,* Ex. 5 at 21 (neurologist deeming Petitioner's complaints to reflect "subjective weakness without definite etiology" and "doubt[ing] GBS" as an accurate explanation). At best, some treaters interpreted the history she provided as possibly establishing she had experienced GBS. Ex. 31 (ECF No. 8-10) at 21. Petitioner has nevertheless continued to complain of sequelae she purports are attributable to GBS, and to seek treatment for her symptoms. *See, e.g.,* Ex. 1 (ECF No. 18-1) at 7 (February 2016 treatment with

6

Dr. Randolph).

B.   Petitioner's Affidavit Concerning Treatment History

In addition to the medical records discussed above, Petitioner offered an affidavit, dated November 28, 2016, detailing the course of her treatment and health history following his receipt of the flu vaccine. *See generally* Ex. 34. Ms. Dickson therein maintains that her symptoms began "approximately 4-5 days" following the receipt of the flu vaccine in October 2013. *Id.* at 1. Her affidavit then proceeds with Ms. Dickson detailing her appointments with her physicians and their overall impressions of her condition, consistent with medical records above. *Id.* In addition, Petitioner states that she continues to experience symptoms at the present time, including severe flare-ups causing her to be bedridden for three days at a time. *Id.* Although Petitioner routinely is able to continue "light duty work" at her place of employment, she uses a cane as needed, holding on to a bed rail to help prevent falls. *Id.*

## II. Procedural History

Ms. Dickson initiated this case as a *pro se* Petitioner on October 20, 2016. Pet. at 1. She was able to file some documentation in support of her claim before present counsel appeared on her behalf on March 2, 2017. After additional medical records necessary for evaluation of the case had been filed, Respondent prepared her Rule 4(c) Report on August 11, 2017, setting forth the view that Petitioner was not entitled to compensation because she had failed to offer sufficient evidence to support her claim - specifically evidence relating to her purported GBS diagnosis. ECF No. 23.

After the filing of the Rule 4(c) Report, I held a status conference on August 23, 2017, to discuss what I perceived as weaknesses in the factual bases for Petitioner's claim. I proposed that Petitioner find an expert to support her claim, and directed that any such report be filed on or before October 31, 2017. *See* Non-PDF Order, dated August 23, 2017. In response, rather than file an expert report, Petitioner filed the pending Motion for Ruling on the Record ("Mot.") (ECF No. 24). The matter is now ripe for adjudication.

## III. Motion for Ruling on the Record

Petitioner's three-page motion begins by forthrightly acknowledging that she was unsuccessful in retaining a medical expert to opine as to caution in the present matter. Mot. at 1.

Thus, although she had retained two experts (a neurologist in Charleston, West Virginia, and a geriatric/rheumatology specialist in Dallas, Texas) to review her records, no expert reports were produced – in particular because of the "[t]he lack of a timely diagnosis of [GBS]." *Id.* at 2.

Ms. Dickson nevertheless maintains that she has shown by a preponderance of the evidence that the influenza vaccine she received caused her to develop GBS. Mot. at 2. The remainder of her motion simply recounts facts and statements made by treaters with regard to her current condition, as summarized above, and makes no reference to any comparable Program decisions involving similar facts that might suggest she should prevail under the present circumstances.

Respondent opposed Petitioner's Motion on November 14, 2017 ("Response") (ECF No. 25). Based upon a detailed exploration of the relevant medical record, Respondent contends that Petitioner has not established GBS as the injury she has suffered. Response at 12-13. In the alternative, Respondent argues that Petitioner has provided no plausible medical theory, scientific evidence, or expert report supporting her contention that the flu vaccine can cause GBS. *Id.* at 13-15. Rather, Respondent characterizes Petitioner's argument as "*post hoc ergo propter hoc*," arguing that a temporal association alone does not suffice to evidence actual causation. *Id.* at 16. Petitioner did not file a reply, and this matter is now ripe for adjudication.

### IV. Applicable Legal Standards

#### A. *Claimant's Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury" – i.e., an injury falling within the Vaccine Injury Table – corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's

8

existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received can cause the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, the petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id*. at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26). Petitioners also frequently present expert testimony in order to bulwark the reliability of a given scientific or medical theory (although there is no Program evidentiary requirement that they do so). *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the

laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id*. at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Human Servs.*, 121 Fed. Cl. 230, 245 (2015) ("[p]lausibility . . . in many cases may be enough to satisfy Althen prong one" (emphasis in original)). But this does not negate or reduce a petitioner's ultimate burden to establish his overall entitlement to damages by preponderant evidence. *W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

However, medical records and/or statements of a treating physician's views do not per se bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence also present in the record – including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions

against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 119, 136 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012); *Veryzer v. Sec'y of Health & Human Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). Id. at 1352; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 2013 WL 1896173 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.   *Law Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

11

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Human Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony – especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; see also *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir.), *cert. den'd, Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where

the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records over contrary testimony, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Resolution of Case Via Ruling on Record*

The Petitioner has requested resolution of this case on the basis of the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *See Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397, 402-03 (1997) (special master acted within his

13

discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Ct. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

Based upon careful review of the medical records and the arguments of both sides, and taking into account my own experience resolving similar claims (as well as parallel decisions from other Vaccine Act cases), I conclude that Petitioner has not established preponderant evidence in favor of her claim.

First, Petitioner has not offered preponderant evidence allowing for the conclusion that she in fact experienced GBS – the claimed vaccine injury in this case – a peripheral neuropathy involving demyelination of nerves that is well understood to have an autoimmune mechanism. *See, e.g*, *Rolshoven v. Sec'y of Health & Human Servs.*, No. 14-439V, 2018 WL 1124737, at *9 (Fed. Cl. Spec. Mstr. Jan. 11, 2018). Vaccine claimants must establish evidence of an injury in order to prevail. *See Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010) (a petitioner "must specify his vaccine-related injury and shoulder[s] the burden of proof of causation").

Here, there is no evidence in the record that any treater ever diagnosed vaccine-induced GBS at or around the time of the vaccination - or later for that matter. At best, the record suggests that Petitioner herself either *informed* treaters (often long after the time of vaccination) that she had been so diagnosed, or that treaters (accepting her reported medical history as true) *assumed* the diagnosis had been given in the past, and accordingly treated the symptoms she presented to them with as if they were true sequelae of a prior course of GBS. But such evidence does not establish the propriety of the alleged diagnosis – and recordation by a treater of what a claimant says does not convert such statements into reliable facts. *See Castaldi v. Sec'y of Health & Human Servs.*, No. 09-300V, 2014 WL 3749749, at *11 (Fed. Cl. Spec. Mstr. June 25, 2014) ("the records of treating physicians can be questioned and the weight afforded to them depends on whether the physician is noting her own observations *or merely recording statements made by the patient*") (emphasis added), *aff'd*, 119 Fed. Cl. 407 (2014).

In addition, and looking at the entirety of the record rather than just portions of it, preponderant evidence does not support the conclusion that Ms. Dickson *did* experience GBS

regardless of whether it was ever diagnosed. The records from the fall of 2013 are particularly critical, given that GBS (a peripheral neuropathy involving nerve demyelination) is well understood to be an acute disease that (when vaccine-caused) begins within four to eight weeks of vaccination. *See Blackburn v. Sec'y of Health & Human Servs.*, No. 10-410V, 2015 WL 425935, at *23 (Fed. Cl. Spec. Mstr. Jan. 9, 2015) (characterizing GBS as rapid and acute in its progression); *Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (eight weeks is the longest reasonable timeframe for a flu/GBS claim). Those initial records evince no evidence of clinical indicia of GBS (for example, ascending *bilateral* weakness and paresthesias), while establishing Petitioner's normal DTRs, something a GBS patient would *not* display. *See Pless v. Sec'y of Health & Human Servs.*, No. 16-271V, 2017 WL 836610, at *3 (Fed. Cl. Spec. Mstr. Feb. 6, 2017). Petitioner's own statements about the character of her symptoms are otherwise insufficient evidence to base factual determination supportive of a finding of entitlement. *See* Section 13(a)(1); *see, e.g., Lozano v. Sec'y of Health & Human Servs.*, No. 15-369V, 2017 WL 3811124, at *7 (Fed. Cl. Spec. Mstr. Aug. 4, 2017).

Second, if I assume that some of Petitioner's symptoms[3] *could* credibly be deemed to have been indicia of GBS despite the lack of a proper diagnosis, Petitioner's claim would still founder on the third of the three *Althen* prongs[4], which requires a petitioner to demonstrate that onset occurred in a medically acceptable timeframe. In this case, the medical record reveals that *no* treaters even mentioned GBS as a possible explanation for Petitioner's symptoms before February 2014 – nearly four months post-vaccination. Even if this had been the start of Petitioner's GBS, I am aware of no Program cases finding a 16-week onset for vaccine-caused GBS is medically acceptable – and as Petitioner's motion acknowledges, the timing issue was the primary stumbling block she faced in obtaining an expert willing to offer a causation opinion in this case. *See* Mot. at 2 ("The lack of a timely diagnosis of [GBS] precludes Petitioner from proving causation by an

---

[3] Petitioner's November 2013 symptoms would be close enough in time to the vaccination to establish a medically acceptable causal timeframe *if* they had been properly identified as presenting symptoms of GBS. But, as noted above, Petitioner has never established that in fact she ever had GBS.

[4] Because this case turns primarily on Petitioner's inability to establish the alleged vaccine injury, I do not engage herein in an extended review of each *Althen* prong. *See, e.g., Lasnetski v. Sec'y of Health & Human Servs.,* 128 Fed. Cl. 242, 264 (2016), *aff'd,* 696 F. App'x 497 (Fed. Cir. 2017) (not error for special master to forego *Althen* analysis after determining that a petitioner had not in fact experienced the disease or illness alleged to have been vaccine-caused). I note, however, that the "can cause," prong one showing would be met, given the extensive discussion of the causal relationship between the flu vaccine and GBS in numerous other Program decisions.

expert medical opinion."). Accordingly, and based on the record before me, I cannot find sufficient preponderant evidence supporting the third *Althen* prong herein.

Finally, Petitioner's inability to obtain an expert opinion to support her claim is also a significant blow to the claim's tenability. Even without a formal GBS diagnosis, and even without establishing GBS as the actual injury at issue, Petitioner *could* have proposed a causation theory in which the flu vaccine was deemed causal of the myalgias and other symptoms the records reveal she complained of in November 2013, and that this was the start of a longer course of disease that still persists. Certainly many other petitioners have made similar arguments. To do so effectively, however, she would have needed some combination of (a) medical or scientific literature corroborating her claim that the flu vaccine can cause injuries akin to what she experienced[5], (b) treater support for the conclusion that the flu vaccine was the cause of her injury, and/or (c) a persuasive, reliable expert opinion explaining how Ms. Dickson's course of post-vaccination symptoms over the two-plus years after vaccination is consistent with the pathogenesis of a vaccine-caused disease. But Petitioner has offered no such evidence, and the existing record does not support the conclusion that Petitioner's actual course of symptoms, however defined, is consistent with a vaccine-caused injury.

## CONCLUSION

The record does not support Ms. Dickson's contention that the flu vaccine caused her to develop GBS, and it does not reflect circumstances in which that vaccine could be linked to her purported injury (especially in the absence of a supportive expert opinion). Petitioner has therefore not established entitlement to a damages award, and I must DISMISS her claim.

In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this decision.[6]

---

[5] Petitioner filed no such medical literature in this case. Although this kind of evidence is not generally *required* for a claimant to prevail (*Andreu*, 569 F.3d 1378-79 (citing *Capizzano*, 440 F.3d at 1325-26)), under the facts of this case Petitioner needed *some kind* of additional support for me to conclude on this record (which does not have a clearly-articulated treater opinion explaining her symptoms) that the flu vaccine could cause the kind of injury she might allege alternatively to GBS.

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Special Master